UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHAEL MARSHALL,**

        **Plaintiff,**

-v-

        Case No.: 2:15-cv-775
        **JUDGE SMITH**
        **Magistrate Judge Deavers**

**OHIO UNIVERSITY,** *et al.***,**

        **Defendants.**

## OPINION AND ORDER

Plaintiff Michael Marshall initiated this case against Defendants Ohio University, Ryan Lombardi, and Diane Bouvier alleging a violation of his First Amendment right to free speech, a violation of his civil rights under 42 U.S.C. § 1983, and violations under Title IX of the Education Amendments of 1972.  (*See* Doc. 1, Compl.).  Plaintiff has been suspended from the University, and this matter is currently before the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. 2), seeking reinstatement.  Defendants filed a Response in opposition to Plaintiff's motion (Doc. 10).  The issue is now ripe as Plaintiff has waived the opportunity to file a reply brief and both parties have agreed to forego an oral hearing on the matter.  (*See* Doc. 9, Sch. Order).  For the reasons that follow, Plaintiff's Motion for Temporary Restraining Order is **DENIED**.

### I.  BACKGROUND

The following facts are set forth for the limited purpose of addressing the immediate motion before the Court.  It should be noted that any findings of fact and conclusions of law made by a district court in addressing a request for injunctive relief are not binding at a trial on

the merits.  *See United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

**A.    The Parties**

Plaintiff Michael Marshall is a student at Ohio University ("OU") in Athens, Ohio.  He has completed three full semesters of courses at OU and has five semesters remaining before he can graduate.  Prior to the incidents giving rise to this case, Marshall had no history of misconduct at the school.  (*See* Doc. 1, Compl. at ¶ 3).

Defendant OU is a public university.  OU voluntarily participates in federal spending programs.  Accordingly, OU has waived its Eleventh Amendment immunity for Title IX purposes, pursuant to 42 U.S.C. § 2000d-7.  Defendant Ryan Lombardi is the Assistant President for Student Affairs at OU.  Defendant Diane Bouvier is the Interim Executive Director at the OU Office for Institutional Equity and the OU Title IX Coordinator.  The OU Office for Institutional Equity is charged with enforcing OU's Sexual Misconduct Policy.  (*Id*. at ¶¶ 4-6).

**B.    Ohio University's Sexual Misconduct Policy**

OU adopted its current Sexual Misconduct Policy ("Policy") on August 3, 2012.  (*Id*. at ¶ 14).  The Policy applies to all students, employees, volunteers, and agents of OU.  The Policy is intended to prohibit "sexual misconduct in any of its employment situations or educational programs and activities."  (*See* Policy at 1, attached as Exhibit A to Plaintiff's Compl.).  The purpose of the Policy is "to provide a fair process for determining if a violation of this policy occurred, to remediate the effects of conduct that violates this policy, and to provide information to prevent sexual misconduct."  (*Id*.).

The Policy defines six types of sexual misconduct offenses: sexual harassment by *quid pro quo*, sexual harassment by hostile environment, non-consensual sexual intercourse, non-consensual sexual conduct, sexual exploitation, and retaliatory harassment.  Of relevance to this case is the Policy's provisions regarding sexual harassment by hostile work environment. The Policy states in pertinent part:

**§ 03.004: Sexual Misconduct**

. . . .

    **V.**    **Definitions of Sexual Misconduct Offenses**

    Sexual harassment includes sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature that is unwelcome and is sufficiently severe or pervasive from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint.  Sexual harassment occurs under either of two circumstances, as discussed in Subsections A and B, immediately below.

. . . .

    **B.**    **Sexual Harassment by Hostile Environment**

    1.    Such conduct has the purpose or effect of unreasonably interfering with a person's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

    2.    The determination of whether an environment is "hostile" is often contextual and must be based on the circumstances.  These circumstances could include:

- The frequency of the conduct;
- The nature and severity of the conduct;
- Relationship between alleged harasser and subject of the alleged harassment;
- Location and context in which the alleged conduct occurs;
- Whether the conduct was physically threatening;
- Whether the conduct was humiliating;
- Whether the conduct arose in the context of other discriminatory conduct.

    3. A hostile environment could be created by repeated, unwanted, sexually oriented stares (maintaining eye contact is, of course, acceptable).

The Office for Institutional Equity is responsible for investigating complaints of sexual misconduct under the Policy.  The OU Code of Conduct states that OU provides the following rights to students:

  a. The right to remain silent;
  b. The right to cross-examine the complainant and witnesses;
  c. The right to examine all written materials;
  d. The right to present evidence, including character witnesses;
  e. The right to request the removal of any University Hearing Board member by showing written or verbal evidence of bias against the accused;
  f. The right to be accompanied by an advisor who must be a member of the University community;
  g. The right to be accompanied by an attorney in cases where criminal charges are pending or likely to be pending. The policy "Hearing Board Guidelines for Lawyers" is available from the Office of Community Standards; and
  h. The right to file an appeal

(Compl. ¶ 21).

If a person is found to have violated the Policy following an investigation, he/she will be subject to disciplinary action which may include "sanctions up to and including, termination of employment or expulsion from the university." (Policy at 7).  Additionally, OU has adopted "sanctioning guidelines" for certain violations of the Policy, informing students to "expect a minimum of 1 semester suspension" for any sexual misconduct violations of the Policy. (*See* Compl. ¶ 19).

**C.** **The Alleged Conduct**

In the case at bar, Plaintiff Marshall met a fellow OU student, A.H., in 2013 when A.H. transferred into the Honors Tutorial College.  (*Id*. at ¶ 24).  Plaintiff and A.H. became friendly

and would often exchange text messages about both academic assignments and social events. (*Id*.). In Fall 2014, both students lived in the same honors residence hall complex. (Doc. 10, Ex. A, Frith Aff. ¶ 7). They also were scheduled to take a small group "tutorial class," in which they were the only two students enrolled. (*Id*. at ¶¶ 4-6). During the fall semester, Plaintiff began sending A.H. several text messages in an attempt to engage in a romantic relationship with her. Examples of these texts from early October include:

> "I'm very drunk right now, and I've tried to compose something to send to you but I cannot. Therefore I say to you: ❤"
>
> "I heard that you made out with the girl with the eyebrow piercing. I agree. Goddamn. That's my goal tonight, although I have serious doubts about whether or not I will be successful, because I can no longer conduct myself in a comely fashion"
>
> "I don't know what you think or feel. What I do know is that you are fabulously attractive and fabulously intelligent in that I know that I can tell you all this and that nothing will change between us"

(Compl. ¶ 26).

A.H. responded to Plaintiff's texts by writing: "it might take me a while to give you a proper response but I don't want to leave you hanging in the meantime." She later responded, "I like you a lot, but in a platonic way." Marshall texted back, "there is nothing I can say to change your mind. I know that.… Like I really like you and I don't know why. Well, life goes on." (*Id*. at ¶ 27).

Despite A.H.'s polite declinations, Plaintiff continued his pursuit. On October 12, 2014, Marshall again tried to convince A.H. to enter into a romantic relationship, and the following texts were exchanged:

> Marshall: "just come, I'm not asking for any commitment here. Or, and I want to be clear, you do have the less amicable option of politely, but plainly, tell me to fuck off and general and I will respect it and not hold it against you."

> A.H.: "I'm not interested in getting dinner with you. I been very patient with you because I know you're a good guy, but you being a good guy is not enough to make me interested in dating you. I do not want to fuel the fire by going to dinner with you. I'm also not going to apologize. You presented me with multiple opportunities to go out with you and I'm politely declining."
>
> Marshall: "I know and I understand. I've been out of hand and I am the one who should apologize. I hope we can maintain a courteous friendship."

(*Id*. at ¶ 29).

Plaintiff continued to send additional text messages to A.H., to which she ultimately responded: "I'm going to tell you honestly that you need to leave me alone, let it be, it's not going to happen." Marshall said, "I know." He added, "however, since I'm still drunk enough to make a fool out of myself, Let me propose to you that if you ever need a friends with benefits, or anything of that sort I am available and I will still be totally willing to leave you alone." She responded, "I'm not interested." (*Id*. at ¶ 30).

On November 14, 2014, following a party attended by both Marshall and A.H., Marshall again texted A.H. and stated: "use that perfect ass so no one else has to." A.H. responded, "Actually fuck you. I have serious problem. With you." (*Id*. at ¶ 31).

A.H. notified one of her professors at the Honors Tutorial College about Plaintiff's behavior. (Frith Aff. ¶ 8). A.H. acknowledged that she did not feel unsafe, but claimed that her "academic environment has been disrupted." (Compl. ¶ 36). She further complained that "Marshall had touched her shoulders while intoxicated at a party, but also indicated that Marshall did not continue to touch her after she told him that this made her uncomfortable." (*Id*.). On November 18, 2014, a formal complaint was filed with the OU Office for Institutional Equality. (*Id*. ¶ 36).

On December 12, 2014, Plaintiff was notified that the Office for Institutional Equality had begun an investigation into A.H.'s complaint. (*Id*. at ¶ 37). In addition to Plaintiff, five other witnesses were interviewed. (*Id*. at ¶ 38). OU held a hearing on the complaint on January 29, 2015. The hearing panel found that Plaintiff's conduct met the criteria for the definition of sexual harassment, stating that Marshall "repeatedly continue [sic] to communicate with [A.H.] in a manner that made her feel uncomfortable and disrupted our [sic] ability to focus in the academic environment, due to their classroom requirements and future frequent interactions." (*Id*. at ¶ 39). The hearing panel recommended that Marshall be suspended for a semester, but that he could petition for readmittance after completing certain tasks, including a research paper and an alcohol and drug assessment. (*Id*. at ¶ 40). Plaintiff appealed the decision. On February 24, 2015, Lombardi completed his review of Marshall's appeal and upheld the decision and sanction of the hearing panel. (*Id*. at ¶ 42).

Plaintiff then initiated this case on March 4, 2015 seeking injunctive relief to be reinstated as a student for the current semester.

## II. STANDARD OF REVIEW

Rule 65(b) of the Federal Rules of Civil Procedure permits a party to seek injunctive relief to prevent immediate and irreparable injury. A temporary restraining order is an extraordinary remedy whose purpose is to preserve the status quo. *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). The burden of proving that the circumstances "clearly demand" such an extraordinary remedy is a heavy one: "[t]he party seeking the injunction must establish its case by clear and convincing evidence." *Overstreet v.*

*Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998).

The factors considered in granting a temporary restraining order or a preliminary injunction are similar in nature. In the Sixth Circuit, it is well-settled that the following factors are to be considered in determining whether a temporary restraining order is necessary:

> (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the relief requested; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004); *see also Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001) (no single factor is determinative).

The decision whether to issue a temporary restraining order or preliminary injunction falls within the sound discretion of the district court. *See Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). Ultimately, "[t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (*citing Stenberg v. Checker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)).

### III. DISCUSSION

Plaintiff Michael Marshall initiated this case against Defendants asserting claims for violation of his First Amendment right to free speech, a violation of his civil rights under 42

U.S.C. § 1983, and violations under Title IX of the Education Amendments of 1972. Plaintiff seeks a temporary restraining order, reinstating him to OU, on his claims for violation of his First Amendment rights and violation of Title IX, asserting that he has a strong likelihood of success on the merits of his claims, and that he has sufficiently set forth the other requirements justifying a temporary restraining order. The Court will consider each of Plaintiff's claims in the context of the four factors listed above to determine whether a temporary restraining order is warranted in this case.

**A.     Likelihood of Success on the Merits**

    **1.     First Amendment Claims**

Plaintiff argues that there is a substantial likelihood that he will succeed on the merits of his First Amendment claim because the Policy (1) is overbroad, and (2) "lacks any relationship to the intent of the speaker to cause harm." (Doc. 2, Pl.'s Mot. at 7). To the contrary, OU asserts Plaintiff's free speech arguments are devoid of any merit, as the Policy is narrowly tailored to fully comport with the First Amendment.

        **a.     Overbreadth**

Plaintiff first argues that the "sweeping" language of the Policy, specifically § 3.004, is overbroad, and thus constitutionally invalid. In considering whether a statute or policy violates the First Amendment on overbreadth grounds, the Court must resolve two issues. First, the Court must "determine whether the regulation reaches a substantial amount of constitutionally protected speech." *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990). Second, the Court must address whether the policy is constitutionally invalid under the void for vagueness doctrine. *See id.*; *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1183-84 (6th Cir.

1995).  A policy will be considered "void for vagueness" if it (1) "denies fair notice of the standard of conduct to which a citizen is held accountable" or (2) constitutes "an unrestricted delegation of power," inviting "arbitrary, discriminatory and overzealous enforcement." *Leonardson*, 896 F.2d at 196 (quoting *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977)).

The Court finds that Plaintiff has failed to demonstrate he is likely to prevail on his allegations that the Policy, set forth above in Section I.B., reaches a substantial amount of constitutionally protected speech and/or implicates the void for vagueness doctrine.  OU's policy is carefully drafted and narrowly tailored, balancing the need to prohibit certain types of harassing behavior with a student's free speech rights.  Plaintiff argues that the Policy "seems to reach a substantial amount of constitutionally protected speech—including any effort by any student to ask another student out on a date." (Doc. 2, Pl.'s Mot. at 8).  But the Court finds Plaintiff overstates the Policy's reach: to be actionable, § 3.004 requires an individual's actions to be objectively and subjectively severe or pervasive so as to cause, or be intended to cause, an intimidating, hostile, or offensive work, academic, or living environment.  Ordinarily, asking someone on a date in a reasonable manner does not require or entail severe and pervasive behavior that rises to a level of intimidation, hostility, or offensiveness (even if the offer is unwelcome or rejected).

Further, despite Plaintiff's contentions, the Policy explicitly considers the situation not only from a complainant's point of view, but also from "an objective (reasonable person's) viewpoint." (Policy at 2-3).  This safeguard effectively protects individuals from the danger oversensitive complainants may pose in punishing or restricting otherwise reasonable protected

-10-

speech.  Finally, the Policy does not merely define "Sexual Harassment by Hostile Environment" in a general sense: it also puts individuals on notice as to what specific circumstances OU will consider in reviewing their behavior, such as the frequency, nature, and severity of the harassment, whether the harassment was physically threatening or humiliating, and other contextual issues such as the relationship between the parties.

Plaintiff relies predominately on two cases in his motion: *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995) and *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008).  In both of these cases, the Courts of Appeals found that each university's respective policy violated the First Amendment on overbreadth grounds.  But the policies underlying both of those decisions were significantly less detailed and narrowly tailored than the one at issue here.  For instance, in *Dambrot*, the Court criticized the university's policy for its overinclusiveness and for its failure to include any objective viewpoint.  *Dambrot*, 55 F.3d at 1182-84.  The Third Circuit shared similar concerns about Temple University's sexual harassment policy in *DeJohn*.  *See DeJohn*, 537 F.3d at 316-19.  But Plaintiff has not clearly explained how OU's policy shares these deficiencies.  Section 3.004 appears to be narrowly tailored to only proscribe conduct that, when viewed both subjectively *and* objectively, (1) is unwelcome, (2) is of a sexual nature, (3) is severe or pervasive, and (4) has the purpose or effect of unreasonably interfering with the complainant's work or studies or otherwise creating a hostile environment.  These requirements not only provide significantly more detail and notice than the policies reviewed by the *Dambrot* and *DeJohn* courts, they specifically track Title VII's definition of "sexual harassment" as well as the language used by the U.S. Supreme Court in reviewing sexual harassment cases.  *See* 29 C.F.R. § 1604.11 ("Unwelcome sexual advances,

-11-

requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."); s*ee also, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."); *Wilkie v. Robbins*, 551 U.S. 537, 582 (2007) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999) (for plaintiff to succeed on Title IX sexual harassment claim, he or she must demonstrate harassment that is "severe, pervasive, and objectively offensive").

Based on the foregoing, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits of his claim that the Policy is overbroad and encompasses or punishes constitutionally protected speech. Additionally, the Court finds Plaintiff has ignored the fact that § 3.004 contains both a subjective and objective component, which seemingly protects individuals from arbitrary and unreasonable outcomes.

        **b.**    **Lack of Intent**

Plaintiff next argues that the First Amendment requires OU "to demonstrate that he had a subjective intent to cause harm to A.H. before he can be suspended from school." (Doc. 2, Pl.'s Mot. at 10). OU contends that a *mens rea* requirement is not necessary to regulate the kind of harassing speech at issue here.

The Court finds Plaintiff's second argument not well-taken for many of the same reasons set forth above. OU's Sexual Misconduct Policy is narrowly tailored and mirrors federal regulations and case law. That it does not require malicious intent on behalf of the speaker does not render the provision unconstitutional; it is the *effect* on the school/working environment that allows schools to regulate disruptive speech, not the intent behind it. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512-14 (1969). Finally, the Court notes that Plaintiff has provided the Court with no precedent in which a court has deemed a harassment policy void for "lack of intent."

For these reasons, the Court finds both of Plaintiff's free speech arguments unavailing. Thus, the Court finds Plaintiff has failed to show that he has a substantial likelihood of succeeding on the merits as to his First Amendment cause of action.

2. **Title IX Claim**

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforceable through an implied right of action for monetary damages, as well as injunctive relief. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 76 (1992).

Plaintiff asserts violation of Title IX under two separate theories of relief: erroneous outcome and deliberate indifference.

### a. Erroneous Outcome

To prevail on an erroneous outcome theory Plaintiff would ultimately need to prove the hearing was flawed due to his gender. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) (reversed on other grounds). Specifically, a plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary hearing" as well as "a causal connection between the flawed outcome and gender bias." *Yusuf*, 35 F.3d at 715. The Second Circuit explained:

> If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail. We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement.

*Id.* Further, "a plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* Examples of these circumstances include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Plaintiff does not dispute that he sent A.H. a series of inappropriate text messages as set forth above. However, he argues that his "suspension for sending text messages without any suggestion of a threat of violence – are sufficient to raise an inference of gender bias." (Pl.'s Mot. at 11). But allegations of an erroneous outcome "combined with a conclusory allegation of gender discrimination" cannot form the basis of Plaintiff's TRO request. *See Yusuf*, 35 F.3d at 715 (noting that a conclusory statement of gender bias is not sufficient to survive a motion to dismiss). As OU points out, Plaintiff has not pled any facts to support his contention that gender

bias was "a motivating factor" of his suspension. He has not provided any gender-biased statements or questions posed by university officials during the disciplinary hearing, nor has he alleged that OU has had any issues with the Department of Education, in the past, or currently, that would require them to issue a harsh sanction. Further, the sanctions were clearly set forth by OU in its "sanctioning guidelines" and were not arbitrarily determined by the panel. The sanctioning guidelines explicitly state that any violation of the Policy will likely result in a minimum of one semester suspension.[1]

The Court notes that Plaintiff seeks to conduct expedited discovery "aimed at determining whether OU has a pattern of decision-making based on gender," which may ultimately provide Plaintiff with support for his claim. (Pl.'s Mot. at 13). But Plaintiff has the burden of proving that a TRO is warranted, and that he is substantially likely to succeed on the merits of his claim, *now*. Plaintiff may use evidence obtained in discovery to support his request for a preliminary injunction down the road, but at this juncture the Court cannot find that his unsupported speculations and inferences rise to the level of "a substantial likelihood of success."[2]

---

[1] It seems that the guidelines could allow for a warning and/or probation in some instances, like the case at bar. But even if this Court agrees with Plaintiff that the punishment does not seem to fit the crime here, that sentiment alone does not equate to a "substantial likelihood of success on the merits." The Court is not tasked with rewriting OU's sanctioning guidelines; it is tasked only with determining whether there was some gender bias behind an erroneous outcome. Considering that Plaintiff does not contest that he actually sent the inappropriate texts, there does not appear to be any allegation of an erroneous finding by the panel. Nor has Plaintiff made sufficient allegations or suggestions that there is evidence of gender bias with respect to his case.

[2] The Court has reviewed the case of *Wells v. Xavier University*, 7 F. Supp. 3d 746 (S.D. Ohio 2014), which Plaintiff relies on in support of his arguments, but finds that it does not affect the Court's conclusion. In *Wells*, the case was before the court on a motion to dismiss. Therefore, the court only had to consider whether the plaintiffs had *plausibly* pled a claim for violation of Title IX. In the case at bar, Plaintiff must establish that he has a substantial likelihood of success on the merits of his claim, a standard much more demanding than that required to survive a motion to dismiss or even summary judgment. *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.").

For these reasons the Court finds Plaintiff has failed to show that he has a substantial likelihood of succeeding on the merits of his Title IX "erroneous outcome" cause of action.

### b. Deliberate Indifference

To maintain a deliberate indifference claim under Title IX, Plaintiff must establish that an official of the institution who had the authority to institute corrective measures had actual notice of, and failed to correct, the alleged misconduct. *Mallory v. Ohio University*, 76 Fed. App'x. 634, 640 (6th Cir. 2003). It is unclear as to how exactly this claim applies to the facts of this case, as usually, this claim is asserted by a victim against a school or university official who *failed* to protect him or her from harassment or otherwise address the alleged misconduct— actions that OU officials undisputedly took, to *protect* the alleged victim *from* Marshall. Even if the Court construed Plaintiff's claim liberally as alleging that the university was deliberately indifferent towards the panel's gender discrimination against Plaintiff, the Court finds it would still fail for many of the same reasons articulated above. Plaintiff admits to persistently sending unwelcome sexual text messages to A.H. OU became aware of the situation, and—so as *not* to be deliberately indifferent to student harassment—initiated an investigation of the matter. After a hearing, the panel found Plaintiff violated the Policy and issued a one-semester suspension, pursuant to its sentencing guidelines. Without being presented with any facts or evidence to the contrary, the Court cannot find that OU's decision was the result of gender discrimination or anything other than Plaintiff's inappropriate behavior towards A.H.

For these reasons, the Court finds Plaintiff has failed to establish that he has a substantial likelihood of success on the merits of both his First Amendment and Title IX claims.

**B.     Irreparable Harm**

After examining a plaintiff's likelihood of success on the merits of their claims, a court must balance those conclusions and findings with other factors, including the possibility that the denial of a temporary restraining order will cause irreparable harm to the plaintiff.

Plaintiff asserts that his dismissal from OU would "deny him the benefits of education at his chosen school, would damage his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career." (Pl.'s Mot. at 14). Further, even if readmitted to OU, he faces the possibility of permanent exclusion from the Honors Tutorial College, although he can appeal for reinstatement. (*See* Frith Aff. ¶ 9).

Other courts have found that a student's suspension from school can cause irreparable harm. *See Boman v. Bluestem Unified Sch. Dist.*, 2000 U.S. Dist. LEXIS 5389 (D. Kan. Jan. 28, 2000)*; see also Bhandari v. Trustees of Columbia Univ. in N.Y.*, 2000 U.S. Dist. LEXIS 3720, at *15–16 (S.D.N.Y. 2000). The Court agrees that the denial of a temporary restraining order here will likely cause Plaintiff irreparable harm. His suspension effectively denied him the benefit of the work already performed in the classes this semester and delayed the completion of his degree. Finally, Plaintiff will forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution, or affect his future career possibilities. Thus, the Court finds this factor weighs in favor of Plaintiff.

**C.     Harm to Others**

Plaintiff asserts that a temporary restraining order in this case will not cause any harm to third parties. Defendants, however, point to the basic (and obvious) fact that the reason Plaintiff has been suspended is that his admitted actions disrupted A.H.'s learning and living

environment.  The Court accordingly finds that issuance of a temporary restraining order would potentially cause harm to A.H.  In this regard, both Plaintiff and A.H. are students in OU's honors tutorial program.  A review of the record reveals that their presence in the program necessarily places them in potentially close proximity with each other given the program's dynamics—small class sizes and small number of students—and the fact that they lived in the same dorm.  (*See* Frith Aff. ¶¶ 3–6).  For instance, during the fall of 2014 (when the harassment occurred) they were the only two students in their required tutorial class.  (*Id.* ¶ 6).  Over the course of several weeks during that semester, Plaintiff repeatedly sent text messages (some of a suggestive or sexual nature) to A.H. seeking a romantic relationship even after his advances were clearly and definitively rebuffed by A.H.  While Plaintiff's actions did not make A.H. feel physically unsafe, they did cause interference with her academic environment to the point where she finally strongly informed Plaintiff of her "serious problem" with his actions and reported his unwelcome advances.

A.H. can rightfully expect to pursue her education in an environment free from the harassing behavior of a fellow student.  From the record before it, the Court concludes that issuance of a temporary restraining order reinstating Plaintiff to the honors tutorial program and thus placing Plaintiff and A.H. into close proximity, could potentially interfere with that right, thereby causing significant harm to A.H.

**D.     Public Interest**

Turning to the final factor, Plaintiff asserts that the public interest also favors the granting of a temporary restraining order.  There is no question that there is a strong public interest in protection of our constitutional rights.  *See Am. Freedom Def. Initiative v. Suburban Mobility for*

*Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) ("the public interest is promoted by the robust enforcement of constitutional rights"). However, as set forth above, Plaintiff has not established a strong likelihood of succeeding on his constitutional claims and the Court accordingly cannot reach the conclusion that the Policy in fact violates constitutional rights. As such, Plaintiff cannot show that issuance of a temporary restraining order is in the public interest.

The Court also agrees with Defendant's argument that university officials should be afforded some level of deference in their disciplinary decisions and processes. *See Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998). Issuing a temporary restraining order in this case, and in others similar to it, would likely interfere with OU's ability to enforce its disciplinary standards. Absent facts or evidence evincing a substantial likelihood of success on the merits, the Court is reluctant to interfere with OU's disciplinary processes, which are specifically designed to "provide an environment that facilitates learning." (Defs.' Resp. Br. at 13).

For these reasons, the Court finds the "public interest" factor weighs in favor of OU.

**E.     Balance of Factors**

In summary, the Court finds that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his First Amendment and Title IX claims—the factor often deemed "most important" to the Court's analysis. *See H & H Indus., Inc. v. Miller*, No. 2:13-CV-907, 2013 WL 6858760, at *5 (S.D. Ohio Dec. 27, 2013) (Graham, J.) ("Though no one factor is controlling, likelihood of success on the merits is often the most important factor in evaluating a motion for preliminary injunctive relief."); *see also Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) (noting that the likelihood of success on the merits will "often be the

determinative factor" especially in First Amendment cases).  The Court also finds that the "harm to others" and "public interest" factors weigh against the issuance of a TRO at this juncture.  Therefore, although Plaintiff may indeed suffer irreparable harm if OU's suspension is allowed to stand, the Court cannot find that the factors, when balanced against each other, weigh in his favor.  Accordingly, the Court concludes that the issuance of a temporary restraining order is not warranted in this instance.

## IV.   CONCLUSION

Based on the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order is **DENIED**.

The Clerk shall remove Documents 2 and 3 from the Court's pending motions list.

The telephone conference on Plaintiff's Motion for Preliminary Injunction remains scheduled for Tuesday, March 17, 2015 at 10 a.m.

**IT IS SO ORDERED.**

 *s/ George C. Smith*
 **GEORGE C. SMITH, JUDGE**
 **UNITED STATES DISTRICT COURT**