## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MICHAEL MARSHALL,**

        **Plaintiff,**

                                      **Case No.: 2:15-cv-775**

    **-v-**                                      **JUDGE SMITH**

                                              **Magistrate Judge Deavers**

**OHIO UNIVERSITY,** *et al.*,

        **Defendants.**

### OPINION AND ORDER

Plaintiff Michael Marshall ("Marshall") initiated this case against Defendants Ohio University ("OU"), Ryan Lombardi ("Lombardi"), and Diane Bouvier ("Bouvier"). Marshall alleges that OU violated Title IX of the Education Amendments of 1972 and that the individual Defendants violated his civil rights under 42 U.S.C. § 1983. (*See* Doc. 23, Am. Compl.). Marshall seeks a declaratory judgment, money damages, and injunctive relief. This matter is currently before the Court on Defendants' Motion to Dismiss (Doc. 28), Plaintiff's Opposition (Doc. 29), and Defendants' Reply (Doc. 32). The matter is ripe for review. For the reasons that follow, Defendants' Motion to Dismiss is **GRANTED**.

### I.    BACKGROUND

**A.    The Parties**

Plaintiff Marshall is a student at OU in Athens, Ohio. He has completed three full semesters of courses at OU and has five semesters remaining before he can graduate. Prior to the incidents giving rise to this case, Marshall had no history of misconduct at the school. (Doc. 23, Am. Compl. at ¶ 3).

Defendant OU is a public university.  Defendant Ryan Lombardi is the Assistant President for Student Affairs at OU.  Defendant Diane Bouvier is the Interim Executive Director at the OU Office for Institutional Equity and the OU Title IX Coordinator.  The OU Office for Institutional Equity is charged with enforcing OU's Sexual Misconduct Policy.  (*Id.* at ¶¶ 4–6).

**B.    Ohio University's Sexual Misconduct Policy**

OU adopted its current Sexual Misconduct Policy (the "Policy") on August 3, 2012.  (*Id.* at ¶ 15).  The Policy applies to all students, employees, volunteers, and agents of OU.  The Policy is intended to prohibit "sexual misconduct in any of its employment situations or educational programs and activities."  (*See* Doc. 1, Compl., Ex. A).[1]  The purpose of the Policy is "to provide a fair process for determining if a violation of this policy occurred, to remediate the effects of conduct that violates this policy, and to provide information to prevent sexual misconduct."  (*Id.*).

The Policy defines six types of sexual misconduct offenses: 1) sexual harassment by *quid pro quo*; 2) sexual harassment by hostile environment; 3) non-consensual sexual intercourse; 4) non-consensual sexual conduct; 5) sexual exploitation; and (6) retaliatory harassment.  (Doc. 1, Compl., Ex. A at 2–4).  Of relevance to this case are the Policy's provisions regarding sexual harassment by hostile environment.  The Policy states in pertinent part:

> **§ 03.004: Sexual Misconduct**
>
> . . . .
>
> ### V.    Definitions of Sexual Misconduct Offenses
>
> Sexual harassment includes sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature that is unwelcome and is sufficiently severe or pervasive from both a subjective (the complainant's) and an objective (reasonable

---

[1] The Court takes notice of the Policy which is attached to the original Complaint and discussed at length in the Amended Complaint without converting the Motion to Dismiss to one seeking summary judgment.  *See Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir. 2001).

person's) viewpoint.  Sexual harassment occurs under either of two circumstances, as discussed in Subsections A and B, immediately below.

. . . .

**B.    Sexual Harassment by Hostile Environment**

1.    Such conduct has the purpose or effect of unreasonably interfering with a person's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

2.    The determination of whether an environment is "hostile" is often contextual and must be based on the circumstances.  These circumstances could include:

- The frequency of the conduct;
- The nature and severity of the conduct;
- Relationship between alleged harasser and subject of the alleged harassment;
- Location and context in which the alleged conduct occurs;
- Whether the conduct was physically threatening;
- Whether the conduct was humiliating;
- Whether the conduct arose in the context of other discriminatory conduct.

3.    A hostile environment could be created by repeated, unwanted, sexually oriented stares (maintaining eye contact is, of course, acceptable).

(Doc. 1, Compl., Ex. A at 2–4).

The Office for Institutional Equity is responsible for investigating complaints of sexual misconduct under the Policy.  (Doc. 23, Am. Compl. at ¶ 18).  OU also utilizes a Code of Conduct for its student which provides the following rights to students:

a.    The right to remain silent;
b.    The right to cross-examine the complainant and witnesses;
c.    The right to examine all written materials;
d.    The right to present evidence, including character witnesses;
e.    The right to request the removal of any University Hearing Board member by showing written or verbal evidence of bias against the accused;
f.    The right to be accompanied by an advisor who must be a member of the University community;

        g.        The right to be accompanied by an attorney in cases where criminal charges are pending or likely to be pending. The policy "Hearing Board Guidelines for Lawyers" is available from the Office of Community Standards; and

        h.        The right to file an appeal

(*Id.* at ¶ 21).

If a person is found to have violated the Policy following an investigation, he/she will be subject to disciplinary action which may include "sanctions up to and including, termination of employment or expulsion from the university."  (*Id*. at ¶ 17).  Additionally, OU has adopted "sanctioning guidelines" for certain violations of the Policy, informing students to "expect a minimum of 1 semester suspension" for any sexual misconduct violations of the Policy.  (*Id*. at ¶ 24).

## C.      The Alleged Misconduct

Plaintiff Marshall met a fellow OU student, A.H., in 2013 when A.H. transferred into the Honors Tutorial College.  (*Id*. at ¶ 25).  Plaintiff and A.H. became friendly and would often exchange text messages about both academic assignments and social events.  (*Id*.).  During the fall semester, Plaintiff began sending A.H. several text messages in an attempt to engage in a romantic relationship with her.  Examples of these texts from early October include:

"I'm very drunk right now, and I've tried to compose something to send to you but I cannot. Therefore I say to you:  ❤"

"I heard that you made out with the girl with the eyebrow piercing. I agree. Goddamn. That's my goal tonight, although I have serious doubts about whether or not I will be successful, because I can no longer conduct myself in a comely fashion"

"I don't know what you think or feel. What I do know is that you are fabulously attractive and fabulously intelligent in that I know that I can tell you all this and that nothing will change between us"

(Doc. 23, Am. Compl. at ¶ 27).

A.H. responded to Plaintiff's texts by writing: "it might take me a while to give you a proper response but I don't want to leave you hanging in the meantime." She later responded, "I like you a lot, but in a platonic way." Marshall texted back, "there is nothing I can say to change your mind. I know that…. Like I really like you and I don't know why. Well, life goes on." (*Id.* at ¶ 28).

Despite A.H.'s polite declinations, Plaintiff continued his pursuit. On October 12, 2014, Marshall again tried to convince A.H. to enter into a romantic relationship, and the following texts were exchanged:

> Marshall: "just come, I'm not asking for any commitment here. Or, and I want to be clear, you do have the less amicable option of politely, but plainly, tell me to fuck off and general and I will respect it and not hold it against you."
>
> A.H.: "I'm not interested in getting dinner with you. I been very patient with you because I know you're a good guy, but you being a good guy is not enough to make me interested in dating you. I do not want to fuel the fire by going to dinner with you. I'm also not going to apologize. You presented me with multiple opportunities to go out with you and I'm politely declining."
>
> Marshall: "I know and I understand. I've been out of hand and I am the one who should apologize. I hope we can maintain a courteous friendship."

(*Id.* at ¶ 30).

Plaintiff continued to send additional text messages to A.H., to which she ultimately responded: "I'm going to tell you honestly that you need to leave me alone, let it be, it's not going to happen." Marshall said, "I know." He added, "however, since I'm still drunk enough to make a fool out of myself, Let me propose to you that if you ever need a friends with benefits, or anything of that sort I am available and I will still totally willing to leave you alone." She responded, "I'm not interested." (*Id.* at ¶ 31).

5

On November 14, 2014, following a party attended by both Marshall and A.H., Marshall again texted A.H. and stated:  "use that perfect ass so no one else has to."  A.H. responded, "Actually fuck you. I have serious problem. With you."  (*Id.* at ¶ 32).

On November 18, 2014, OU's Office for Institutional Equality was notified that A.H. had made a complaint about Marshall.  Marshall was ordered not to have any contact with A.H.  A.H. indicated to OU's Office for Institutional Equality that Marshall had been sending her texts because he wanted to sleep with her.  A.H. acknowledged that she did not feel unsafe, but complained that her "academic environment has been disrupted."  (*Id.* at ¶ 37).  She also asserted that "Marshall had touched her shoulders while intoxicated at a party, but also indicated that Marshall did not continue to touch her after she told him that this made her uncomfortable." (*Id.*).  A.H. noted that Marshall would be outside her classes at times, and once gave her a pack of cigarettes.  (*Id.*).  On November 25, 2014, an OU investigator interviewed A.H.  (*Id.* at ¶ 38). A.H. told the interviewer that she had "a lot of anxiety" about the issue with Marshall, but that Marshall had abided by orders to cease all contact with her.  (*Id.*).

On December 12, 2014, Plaintiff was notified that the Office for Institutional Equality had begun an investigation into A.H.'s complaint.  (*Id.* at ¶ 39).  Marshall and five other witnesses were interviewed as part of that investigation.  (*Id.* at ¶ 40).  OU held a hearing on the complaint on January 29, 2015.  (*Id.* at ¶ 41).  The hearing panel found that Plaintiff's conduct met the criteria for the definition of sexual harassment, stating that Marshall "repeatedly continued to communicate with [A.H.] in a manner that made her feel uncomfortable and disrupted our [sic] ability to focus in the academic environment, due to their classroom requirements and future frequent interactions."  (*Id.* at ¶ 41).  The hearing panel recommended that Marshall be suspended for a semester, but be allowed to petition for re-admittance after

completing certain tasks, including completing a research paper and an alcohol and drug assessment. (*Id*. at ¶ 42). Marshall appealed the decision. (*Id*. at ¶ 43). On February 24, 2015, defendant Lombardi completed his review of Marshall's appeal and upheld the decision and sanction recommended by the hearing panel. (*Id*. at ¶ 46). Since his suspension, Marshall has not petitioned for re-admittance to OU for any subsequent semester.

Marshall initiated this case on March 4, 2015, seeking immediate injunctive relief reinstating him as a student at OU for the current semester, Spring, 2014. This Court denied Marshall's request for immediate injunctive relief (Doc. 11). The Court did, however, allow Marshall to conduct expedited discovery about OU's investigations of alleged Policy violations so that Marshall. (*Id.*). Marshall filed his Amended Complaint on June 9, 2015 (Doc. 23).

## II. STANDARD OF REVIEW

Defendant brings this motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiffs have failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A*shcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the

plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663.  Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint;" a recitation of facts intimating the "mere possibility of misconduct" will not suffice.  *Flex Homes, Inc. v. Ritz-Craft Corp of Michigan, Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

Plaintiff Marshall alleges that OU violated his due process rights, Title IX of the Education Amendments of 1972, and that the individual defendants violated his civil rights under 42 U.S.C. § 1983.  Marshall seeks a declaratory judgment, money damages, and injunctive relief. Defendants moved to dismiss all of Plaintiff's claims under each of his theories of liability. Before reaching the merits of each of Defendants' arguments, Marshall explicitly concedes that OU is not a person subject to § 1983 claims.  (Doc. 29, Pl.'s Rep. at 5).  Consequently, the § 1983 claim against OU in Count II is dismissed.  Additionally, Marshall concedes that Title IX applies to institutions and programs that receive federal funding, but does not reach school officials, teachers, and other individuals.  (*Id.* at 18); *see also*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).  Accordingly, the Title IX claims in Counts III and IV against the individual Defendants are dismissed.  The Court will address Plaintiff's remaining claims in turn.

A.      **Title IX Claims**

In opposition to Defendants' motion, Marshall asserts that OU's disciplinary proceedings were influenced by gender bias and that OU discriminated against him on the basis of gender in violation of federal law.  Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding.  Title IX specifically provides:  "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Because OU is an institution voluntarily participating in federal spending programs, OU has waived its Eleventh Amendment immunity for Title IX purposes pursuant to 42 U.S.C. § 2000d-7.

Title IX was enacted to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities.  Because the statutes share the same substantive goals and because Title IX mirrors the same substantive provisions of Title VI of the Civil Rights Act of 1964, courts interpret Title IX by looking to case law interpreting Title VI. *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984); *see also Horner v. Ky. Athletic Ass'n*, 206 F.3d 685, 689–92 (6th Cir. 2000) (discussing how the United States Supreme Court has used analytical framework in Title VI cases to interpret Title IX).  The Supreme Court has foreclosed disparate impact claims under Title VI.  *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Similarly, although Title IX prohibits intentional gender discrimination, it does not support claims of disparate impact.  *Id.* (stating that "proof of intent . . . is the *sine qua non* to compensatory relief for any type of Title IX violation.").

When determining whether a plaintiff was able to demonstrate that intentional gender discrimination occurred in a university disciplinary proceeding, the Sixth Circuit Court of Appeals utilized the analytical framework provided in *Yusaf v. Vassar College*. *See Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003) (citing *Yusaf*, 35 F.3d 709 (2nd Cir. 1994) (reversed on other grounds)). In *Yusaf*, the Second Circuit Court of Appeals found that Title IX claims arising from disciplinary hearings can generally be challenged under two standards: erroneous outcome and selective enforcement. *Yusaf*, 35 F.3d at 714–15. Under either standard, a plaintiff must show that gender bias was the source of the deprivation. *Id*. at 715; *Sahm v. Miami University*, No. 1:14-cv-698, ___ F. Supp. 3d ___, 2015 WL 2406065, at *4 (S.D. Ohio, May 20, 2015) (Dlott, J.) (citing Title IX's prohibition against discrimination "on the basis of sex"). The plaintiff in *Mallory* also asked the Sixth Circuit to adopt two additional standards for analyzing whether disciplinary proceedings violate Title IX's prescription against intentional discrimination: deliberate indifference and archaic assumptions. *Mallory*, 76 F. App'x at 638–639. Although the *Mallory* Court did not specifically determine whether it would adopt the deliberate indifference and archaic assumptions standards, the court provided no analysis of Plaintiff's claims under either standard. *Id*. at 639.

### 1.    Erroneous Outcome

The gravamen of an erroneous outcome claim is that an "innocent" person was wrongly found to have committed an offense because of his or her gender. *Sahm*, 2015 WL 2406065, at *3 (citing *Yusaf*, 35 F.3d at 715). To state an erroneous outcome claim, a plaintiff must plead two elements: (1) facts sufficient to cast doubts about the accuracy of the outcome of the disciplinary hearing and (2) a causal connection between the flawed outcome and gender bias. *Id*.

In this case, Marshall has failed to meet the first element.  Although Marshall alleges that the punishment he received was unduly harsh, the Amended Complaint does not allege facts sufficient to cast doubt about the accuracy of the disciplinary proceeding.  (Doc. 23, Am. Compl. at ¶¶ 81−82).  Marshall does not dispute that he sent the inappropriate texts to A.H.  Indeed, he affirmatively alleges sending them.  (*Id*. at ¶¶ 27−32).  Additionally, Marshall does not allege that he did not violate OU's Sexual Misconduct Policy.  Accordingly, no doubt is cast about the determination that Marshall violated the Policy.

Nor does Marshall allege facts about procedural irregularities that might cast doubt about that determination.  Marshall does not, for instance, allege that OU failed to follow its disciplinary proceeding procedures or that OU attempted to influence the outcome of the disciplinary proceeding.  Instead, Marshall alleges that the OU Office for Institutional Equality functioned as both an investigator and advocate for alleged victims.  (*Id*. at ¶¶ 22, 81).  Marshall does not, however, allege that the investigator/advocate also functioned as the decision-maker who ultimately determined that Marshall violated the Policy.  Similarly, Marshall alleges that A.H. was allowed to submit a rebuttal to Marshall's appeal and that Marshall was not provided a copy of that rebuttal.  (*Id*. at ¶¶ 81, 45).  But these purported irregularities simply fall short of the types of allegations that raise articulable doubts about the accuracy of an outcome, particularly given that Marshall does not allege the he was "innocent" of a Policy violation or that he did not send the offending texts.  *Cf. Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (Spiegel, J.) (finding the plaintiff pleaded facts sufficient to cast doubts on the accuracy of a disciplinary proceeding by alleging that the defendants rushed to judgment, failed to train the disciplinary hearing panel, ignored a prosecutor's request to hold off on proceedings until a criminal investigation concluded, ignored a prosecutor's opinion that a sexual assault did not

occur, denied the plaintiff access to counsel, and denied the plaintiff witnesses); *Doe v. Case W.*
*Reserve Univ.*, No. 1:14CV2044, 2015 WL 5522001, at *5 (N.D. Ohio Sept. 16, 2015) (finding
that the plaintiff pleaded facts sufficient to cast doubts on accuracy of a disciplinary proceeding
outcome by alleging that the defendant pressured a student to provide evidence against the
plaintiff during an appeal, did not allow the plaintiff to review that evidence, denied the plaintiff
the opportunity to cross examine his accuser during the disciplinary hearing, and treated the
plaintiff in a hostile manner during that hearing).  Accordingly, Marshall's erroneous outcome
claim under Title IX in Counts III and IV is dismissed.

      **2.**      **Selective Enforcement**

      In a selective enforcement claim, a plaintiff essentially asserts that even if he or she did
violate a university policy, the decision to initiate disciplinary proceedings or the severity of the
penalty imposed was motivated by gender bias.  *See Yusaf*, 35 F.3d at 715.  To state such a
claim, Marshall must allege "that a female was in circumstances sufficiently similar to his own
and was treated more favorably by [OU]."  *Mallory*, 76 F. App'x at 641.  Moreover, Marshall
must allege facts that would demonstrate that the difference in treatment was because of his
gender.  *See Sahm*, 2015 WL 2406065, at *3.

      Reading the Amended Complaint in even the most charitable light, Marshall fails to
adequately allege that OU's decision to initiate disciplinary proceedings was motivated by his
gender.  Marshall alleges that that in 2014, 40% of OU's student body was male.  (Doc. 23, Am.
Compl. at ¶ 49).  Marshall alleges, however, that since OU adopted its Policy in 2012, forty three
out of forty six (93%) investigations about students or staff engaging in sexual misconduct

involved allegations that a male violated the Policy.  (*Id.* at ¶¶ 48–49).[2]  Marshall concludes that there are more investigations about alleged male violators because the investigative process is influenced by gender.  (*Id.*).  Nevertheless, Marshall never alleges facts about a single instance when OU declined to investigate allegations that a similarly situated female violated the policy. In fact, Marshall alleges that at least two OU investigations involved allegations about female Policy violators.  (*Id.* at ¶¶ 50, 52).  One female was found to have violated the policy and one female was not.  (*Id.*).  Marshall alleges the female student who was investigated was disciplined after she harassed another female student.  (*Id.* at ¶ 50).  Marshall does not, however, allege that the female violator received a more lenient punishment than Marshall.  In short, Marshall does not allege facts that would, if true, demonstrate that OU decided to investigate A.H.'s allegations about Marshall because Marshall is male and that OU would not have investigated A.H.'s allegations if Marshall was female.  Rather, Marshall's Amended Complaint alleges facts that would, if true, demonstrate that OU has investigated allegations that both male and female students have violated the Policy.

Reading the Amended Complaint in the most charitable light, Marshall also fails to adequately allege that the penalty imposed by OU for violating the Policy was motivated by his gender.  In the Amended Complaint, Marshall alleges that a case from October 2012 is "factually similar to the case against Marshall" except that it involved a female student.  (*Id.* at ¶ 52).  The Amended Complaint states:

> According to a November 12, 2012 letter, a student *presumed* to be female was accused of harassing a male graduate student.  The allegation included the claim that the respondent, like Marshall, 'made numerous requests to date the student

---

[2] Marshall alleges that 40% of *students* at OU are male while 93% of OU's investigations involve allegations that male *students or staff* violated the Policy.  Accordingly, it would be more proper to compare the percentage of male *students and staff* at OU to the percentage of OU's investigations involving allegations that male students or staff violated the Policy.  Nevertheless, even this comparison would not rescue Marshall's claim given that he fails to allege facts that would, if true, demonstrate that OU declines to investigate allegations that females violate the Policy.

> despite his refusal'  The female student was found 'not responsible,' even though there appear to have been enough of a conflict between the two students that a no contact order was imposed.  In contrast, as set forth below, Marshall, a male student, was found 'responsible' and suspended from school for similar conduct based solely on the same conduct: inappropriate requests for dating and sexual relationships.

(*Id.*) (emphasis added).  The Court notes that Marshall only presumes that the student was female.  The Court also notes that the presumably female student made *numerous* requests to date a male graduate student, while Marshall made *inappropriate* requests for dates *and* for a sexual relationship.  (*Id.*).  This indicates that the presumably female student made *multiple* requests for dates while Marshal made *offensive* requests for dates and for sexual relations, including a request to be "friends with benefits" and a request for A.H. to "use that perfect ass so no one else has to."  (*Id.* at ¶¶ 25–33).  Marshall does not allege that the determination that the presumably female student was "not responsible" and that Marshall was "responsible" for violating the Policy was made by the same decision-maker.  Most importantly, the Court notes that for purposes of examining whether the severity of the penalty imposed upon Marshall was influenced by gender bias, it would be more proper for Marshall to compare the penalty imposed upon him for violating the Policy to punishment imposed upon a female student for violating the policy— not comparing Marshall's penalty for violating the Policy to an instance where a female did not violate the Policy.  For these reasons, this Court doubts that the presumably female student is alleged to be sufficiently similar to Marshall.  *See Mallory*, 2003 WL 22146132, at *6; *cf. Pierce v. Commonwealth Life Ins. Co.*, 40 F3d 796, 802 (6th Cir. 1994) (noting that for purposes of Title VII disparate treatment claim a plaintiff must prove that all relevant aspects of his situation are nearly identical to those of the female who he alleges was treated more favorably).

Assuming *arguendo* that the presumably female student is sufficiently similar, Marshall's selective enforcement claim fails because he has not alleged facts that make it plausible that gender bias was the motivating factor behind any difference in their treatment.  Marshall does not, for instance, allege that members of the hearing panel or university officials made statements indicating gender bias against men.

Nor does Marshall allege facts that would, if true, show that OU had a pattern and practice of imposing harsher penalties upon men that violated the Policy than women who violated the Policy.  Marshall alleges that two other male students were placed on disciplinary probation for violating the Policy and that one other male student was, like Marshall, suspended for violating the Policy.  (Doc. 23, Am. Compl. at ¶ 62).  Marshall further alleges that one female student was penalized by OU for harassing another female student in violation of the Policy.  (*Id.* at ¶ 50).  Marshall does not, however, allege that the female Policy violator received a more lenient penalty than the male Policy violators.  Indeed, Marshall does not indicate what penalty the female Policy violator received at all.  Accordingly, these facts, even if true, would fail to establish that OU had a pattern and practice of penalizing men more severely than women for Policy violations.  Rather, the facts allege that OU disciplined different male Policy violators, including Marshall, differently.  Even if true, that does not demonstrate discriminatory animus against males, and it does not implicate Title IX.

The Court also notes that a pattern and practice of differential treatment is not enough to allege gender bias unless a plaintiff's complaint contains allegations that make it plausible that gender was the motivating factor behind that differential treatment.  A mere pattern and practice of treating men and women differently does not reflect the reasons for differential treatment.  *Cf. Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, (6th Cir. 2012) (explaining that

independent circumstantial evidence of discrimination is required in addition to statistical evidence to establish pretext); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) (rejecting contention that "raw data purportedly describing a pattern or practice of underrepresentation and unequal opportunity for women faculty at Columbia leads to the conclusion that gender discrimination is in play").

Here, Marshall not only fails to adequately allege a pattern and practice, he does not allege facts that make it plausible that any pattern and practice would be "because of" gender.  At best, with regard to motive, the Amended Complaint alleges that OU has succumbed to pressure from the Department of Education to "crackdown" on perpetrators of sexual assault and sexual misconduct on university campuses.  (Doc. 23, Am. Compl. at ¶¶ 10, 13, 78).  Even if true, cracking down on perpetrators is not the same as cracking down on men.  *See Sahm*, 2015 WL 2406065, at *4 (explaining that "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against alleged perpetrators, is not equivalent of demonstrating bias against male students"); *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (demonstrating a bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males, even if all of the students accused of assault were male); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims ... indicate[s] nothing about gender discrimination").  Although Marshall makes conclusory allegations, he fails to allege facts demonstrating that OU targets male violators but not female violators.  Instead, he alleges that at least two women were the subjects of investigations at OU and one was penalized by OU for a Policy violation.  For these reasons, Marshall's selective enforcement claim under Title IX in Counts III and IV is dismissed.

### 3.  Deliberate Indifference and Archaic Assumptions

The parties also address Marshall's Title IX claims using two other Title IX standards: deliberate indifference and archaic assumptions.  The deliberate indifference standard applies when a plaintiff seeks to hold a university responsible for sexual harassment.  *See Mallory*, 2003 76 F. App'x at 638–39 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998)). It requires a plaintiff to allege that a university official who had authority to institute protective measures had actual notice of, and was deliberately indifferent to, sexual harassment.  *Id.*  The archaic assumptions standard applies when a plaintiff seeking equal athletic opportunities demonstrates discriminatory intent in actions taken because of classifications based upon archaic beliefs and stereotypes about gender.  *Id.* (citing *Pederson v. La. State Univ.*, 213 F.3d 858, 880– 82) (5th Cir. 2000); *Horner*, 206 F.3d at 693 n.4 (discussing pre-rehearing opinion in *Pederson*)).

The Sixth Circuit has not determined that these Title IX standards, which were developed in sexual harassment cases and cases involving unequal athletic opportunities, are applicable when a plaintiff, like Marshall, claims that intentional gender discrimination occurred in a university disciplinary proceeding.  *See Mallory*, 76 F. App'x at 639–42 (providing no analysis of the plaintiff's claims under either standard).  This Court declines to broaden the current framework used to analyze allegations about discrimination in a university disciplinary proceeding in the absence of controlling Sixth Circuit precedent.  Nevertheless, under any standard, Title IX only prohibits intentional gender discrimination.  Marshall has not alleged facts demonstrating intentional discrimination against him on the basis of his gender with regard to OU's investigation of A.H.'s complaints, the outcome of that investigation and hearing, or the penalty that OU imposed.  Accordingly, Marshall's deliberate indifference and archaic assumptions claims under Title IX in Counts III and IV are dismissed.

**B.      Section 1983 Claims**

In Count II, Marshall alleges a § 1983 claim against the individual Defendants.  Section 1983 confers a right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal law. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 3 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir. 1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived plaintiff of this federal right under color of law.  *Meadows v. Enyeart*, No. 14-cv-4001, ___ F. App'x ___, 2015 WL 5751563, at * 4 (6th Cir. Oct. 1, 2015); *Jones v. Duncan*, 840 F.2d 359, 360–61 (6th Cir. 1988); 42 U.S.C. § 1983.  Here, Marshall unsuccessfully alleges that the individual defendants violated his substantive and procedural due process rights under the United States Constitution.  The Court also concludes that the individual defendants are entitled to qualified and Eleventh Amendment immunity for claims against them in their individual and official capacities.  Accordingly, Marshall's § 1983 claims against the individual defendants in Count II fail.

**1.  Substantive Due Process**

The Fourteenth Amendment to the United States Constitution forbids a state from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  Claims arising from the substantive component of the due process clause fall into one of two categories.  *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994); *Mertik v. Blalock*, 983 F. 2d 1353, 1367 (6th Cir. 1993).  The first type is a claim that state action has violated a fundamental right.  *Id.*  The second type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them.  *Mertik*, 983 F.2d at 1367.

"The test for substantive due process claims of this type is whether the conduct complained of shocks the conscience of the court." *Id.* at 1367−68 (internal quotations and citations omitted).

### a. Fundamental Rights Analysis

Substantive due process protects against government interference with fundamental rights unless that interference is narrowly tailored to serve a proper public purpose. *Washington v. Glucksberg*, 521 U.S. 702, 720−21 (1997). Fundamental rights and liberty interests are the type of rights that are so implicit in the concept of ordered liberty that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Conn.*, 302 U.S. 319, 325 (1937) (overruled on other grounds by *Benton v. Maryland*, 395 U.S. 784 (1969)); *Doe v. Mich. Dept. of State Police*, 490 F.3d 491, 499–500 (6th Cir. 2007). These fundamental rights, which are deeply rooted in this nation's history and tradition, include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Glucksberg*, 521 U.S. at 720 (citations omitted); *see also Doe*, 490 F.3d at 499–500. "The Supreme Court has cautioned, however, that it has 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Doe*, 490 F.3d at 500, (quoting *Glucksberg*, 521 U.S. at 720).

Marshall asserts that the basis for his substantive due process claim is an interest in "continued enrollment at OU free from arbitrary or capricious state action." (Doc. 29, Pl.'s Rep. at 8). The Court assumes that by this, Marshall alleges a right to continued enrollment at OU free from arbitrary suspension for his inappropriate conduct.

The United States Supreme Court has refrained from determining whether continued enrollment in school free from arbitrary state action is protected by substantive due process, and

has instead assumed *arguendo* that such a substantive right exists in cases involving college students who challenge academic dismissals from state universities.  *See e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222–23 (1985) (assuming substantive due process protected a university student's right to continued enrollment but finding actions taken by university officials were not arbitrary); *Bd. of Curators v. Horowitz*, 435 U.S. 78, 91–92 (1978) (assuming a university student could challenge an arbitrary or capricious academic decision but finding actions by university officials were not arbitrary).  Moreover, although the Supreme Court has held that a high school student is entitled to procedural due process in pursuit of a free public education, the high Court has also held that a high school student's right to attend public school is not a "fundamental right" for purposes of substantive due process.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–37 (1973).  The Sixth Circuit has also indicated that a public high school student's right to attendance is not a fundamental right.  *See Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (analyzing whether discipline imposed upon a high school student was not rationally related to an offense instead of strictly scrutinizing the imposition of that discipline pursuant to a substantive due process analysis).  A university student, like Marshall, may arguably have an even lesser claim to substantive due process protection than a high school student.  *See Rogers v. Tennessee Bd. of Regents*, 273 F. App'x 458, 462–463 (6th Cir. 2008) (affirming grant of summary judgment on a university student's claim that her academic expulsion for performance problems and inappropriate clinical behavior violated her substantive due process rights); *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 436−37 (6th Cir. 2006) ("[t]he interests [of a college student] protected by substantive due process are of course much narrower than those protected by procedural due process."); *Bell v. Ohio State Univ.*, 351 F.3d 240, 251 (6th Cir. 2003) ("[w]here . . . there is no equal protection violation, we

20

can see no basis for finding that a medical student's interest in continuing her medical education is protected by substantive due process."). The Court applies this reasoning here, to a challenge brought in the wake of a conduct suspension of university student, and finds that Marshall's interest in continuing his education is not, as a matter of law, a fundamental right protected by substantive due process.

The Court notes that Marshall also alleges that other students received lesser punishments than he received and that this forms the basis of his substantive due process claim. (Doc. 23, Am. Compl., at ¶¶ 60, 62). When a plaintiff alleges that other people are treated differently, a plaintiff alleges a violation of the Fourteenth Amendment's Equal Protection Clause, not a violation of substantive due process clause. U.S. Const. amend XIV, § 1. Marshall has not, however, alleged an equal protection clause claim. The Supreme Court has made clear that when another explicit provision of the Constitution applies to a claim, the protections of the substantive due process clause are unavailable. *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (explaining that when a particular amendment provides an explicit textual source of Constitutional protection against a particular type of governmental behavior, "that Amendment, not the more generalized notion of 'substantive due process' must guide the analysis."); *see also*, *Warren v. City of Athens*, 411 F.3d 697, 706–707 (6th Cir. 2005) (dismissing plaintiff's substantive due process claim where Fifth Amendment Taking Clause was applicable); *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, (6th Cir. 2000) (dismissing plaintiff's substantive due process claim where First Amendment Free Speech clause applied). Accordingly, to the extent Marshall's allegations of differential treatment form the basis of his substantive due process claim, his claim fails because the equal protection clause applies to those allegations.

Because Marshall's right to continue his education is not a fundamental right protected by substantive due process, as a matter of law, the decision to suspend him for one semester is not subject to strict scrutiny.  *Glucksberg*, 521 U.S. at 728.  Instead, that decision will be upheld if it is rationally related to a proper public purpose.  *Valot v. S.E. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997); *H.M. v. Bd. of Educ. of King's Local Sch. Dist.*, No. 1:14-cv-64, 2015 WL 4624629 at *3 (S.D. Ohio Aug. 3, 2015) (Barrett, J.).  Here, Marshall alleges that his suspension was motivated by the desire to show the Department of Education that OU is willing to "crackdown" on perpetrators of sexual assault and sexual misconduct on university campuses.  (Doc. 23, Am. Compl. at ¶¶ 10, 13, 78).  Given that universities have an obligation to provide safe campuses, the Court cannot conclude that this constitutes an allegedly improper purpose.

### b.  Conduct Shocking to the Conscience

On the other hand, a crackdown or a punishment can be so excessive and extreme that it shocks the conscience.  Action by an executive government official that is conscience shocking or arbitrary violates the substantive due process clause.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).  Nevertheless, "only the most egregious official conduct" violates substantive due process under this standard. *Id.* at 846.

The facts alleged by Marshall against the individual defendants simply do not meet this "shocks the conscience" test, even when all inferences are drawn in his favor.  Marshall has not alleged that Bouvier or Lombardi were part of the hearing panel that imposed the one-semester suspension he received.  Although Marshall alleges that Lombardi affirmed the hearing panel's decision, he does not allege what actions, if any, taken by Bouvier violated his substantive or

procedural due process rights. He only alleges her title and place of business. (Doc. 23, Am. Compl. at ¶ 6). The Sixth Circuit, however, holds that the acts taken by each defendant must be pleaded with particularity. *See e.g., Lanman v. Hinson,* 529 F.3d 673, 684 (6th Cir. 2008) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right."). For this reason alone, Marshall's § 1983 claim against Bouvier in Count II is dismissed.

Even if he made such allegations, a one-semester suspension simply falls short of the types of official actions considered extreme enough to be conscience shocking. *See e.g.*, *Rochin v. California*, 342 U.S. 165, 172 (1952) (overturning drug conviction where evidence was obtained by involuntarily pumping a suspect's stomach because such police conduct shocked the conscience); *Weyant v. Okst*, 101 F.3d 845, 856 (2nd Cir. 1996)) (explaining that the behavior of prison guards who deliberately ignore the medical needs of pretrial detainees might shock the conscience in violation of substantive due process); *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (finding that student alleged that a high school principal's actions shocked the conscience when she alleged that the principal pushed down her hotel room door, maliciously threw her against a wall in anger, and slapped her during a field trip). Marshall also alleges that Lombardi affirmed the hearing panel's decision when Marshall appealed. But affirming a one sentence suspension is not conscience-shocking for the same reasons that a one-semester suspension is not conscience-shocking. It simply does not constitute the types of extreme and egregious government behavior that the substantive due process clause protects against.

Because the one-semester suspension is not shocking to the conscience, as a matter of law, it is not subject to strict scrutiny and it will instead be upheld if it is rationally related to a

proper public purpose.  *See Seal*, 229 F.3d at 575 (explaining that a substantive due process claim will only succeed in the "rare case" where there is no rational relationship between school discipline and an offense in a case involving a high school student's suspension for unknowingly possessing a weapon in violation of a zero-tolerance weapons possession policy).  Marshall alleges that his suspension was motivated by the desire to show the Department of Education that OU is willing to "crackdown" on perpetrators of sexual assault and sexual misconduct on university campuses.  (Doc. 23, Am. Compl. at ¶¶ 10, 13, 78).  Given that universities have an obligation to keep campuses safe, and given that Marshall alleges that he repeatedly sent inappropriate and offensive texts to a fellow student, the Court cannot conclude that Marshall has alleged that there is no rational relationship between his offense—violating the Policy—and his penalty—a suspension that prevented him from having continued on-campus contact with A.H. for one semester.  For these reasons, Marshall's § 1983 claims against the individual defendants for violating his substantive due process claims are dismissed.

### 2. Procedural Due Process

Marshall also bases his § 1983 claims on alleged violations of his procedural due process rights.  The Sixth Circuit has explained that "[t]he Due Process Clause of the Fourteenth Amendment prohibits States from depriving 'any person of life, liberty, or property, without due process of law.'"  *Jaber v. Wayne State Univ. Bd. of Governors*, 487 F. App'x 995, 996 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1).  To establish a procedural due process violation, a plaintiff must establish a constitutionally protected property or liberty interest and show that the state deprived the plaintiff of such interest without appropriate procedures.  *See Rogers*, 273 F. App'x at 462 (citing *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 762 (6th 2005)).  "Property interests are not . . . defined by the Constitution."  *Bd. of Regents v. Roth*, 408 U.S.

564, 577 (1972)); *see also Horowitz*, 435 U.S. at 82. "Rather, they are created and defined by 'existing rules or understandings that stem from an independent source such as state law . . . .'" *Roth*, 408 U.S. at 577.

It is not entirely settled in the Sixth Circuit as to whether a student's continued enrollment at a state university is an interest protected by procedural due process. *Compare McGee*, 167 F. App'x 429, 437 ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved.") *with Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions."). Even if the Court assumes that Marshall possessed such a right, the Amended Complaint does not allege that Marshall did not receive whatever process was due.

Notice and opportunity to be heard remain the most basic requirements for procedural due process. *Flaim*, 418 F.3d at 635; *see also Goss v. Lopez*, 419 U.S. 565, 579 (1975). In this case, Marshall alleges that he was notified about A.H.'s complaints about him on November 18, 2014, and ordered not to have contact with her. (Doc. 23, Am. Compl. at ¶ 37). Marshall alleges that on December 12, 2014, he was notified that the Office for Institutional Equality was investigating A.H.'s complaint. (*Id*. at ¶ 39). Marshall also alleges that he and five other witnesses were interviewed as part of that investigation. (*Id*. at ¶ 40). Marshall further alleges that a hearing was held before a panel on January 29, 2015, the panel found that his conduct violated the Policy, and recommended that he receive the one-semester suspension. (*Id.* at ¶ 41). Marshall does not, however, allege that Bouvier or Lombardi were in any way involved in these proceedings. More importantly, Marshall does not allege that he did not have sufficient notice about the hearing, that he was not permitted to fully respond to and defend against A.H.'s

allegations, or that he was denied an opportunity to fully participate in the hearing.  Moreover, although Marshall complains that he was not permitted to read a rebuttal submitted by A.H., Marshall alleges that he was permitted to appeal the panel's determination to Lombardi even though the due process clause does not require an appeal from a school decision reached through constitutional procedures.  *Flaim*, 418 F.3d at 636 (citing *Foo v. Indiana Univ.*, 88 F. Supp. 2d 937, 952 (S.D. Ind. 1999).  Although Marshall complains that Lombardi affirmed the panel's outcome, he fails to allege that the appeal process used by Lombardi to do so was procedurally flawed.  In short, Marshall does not allege facts that would, if true, establish that this administrative process used to suspend him was fundamentally unfair.  For these reasons, Marshall's procedural due process claims are dismissed.

### 3.  Qualified and Eleventh Amendment Immunity for the Individual Defendants

The individual defendants also assert that they are entitled to qualified immunity for claims against them in their individual capacities, and to Eleventh Amendment immunity for claims against them in their official capacities.  The Court agrees.

#### a.  Qualified Immunity

Qualified immunity shields officials from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Consequently, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Qualified immunity from civil actions for damages is not a mere defense to liability, but instead constitutes immunity from suit and an entitlement not to stand trial.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (abrogated on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)).

There are two general steps to the qualified immunity analysis.  The court must determine whether "the facts alleged show the officer's conduct violated a constitutional right" and whether that right was "clearly established."  *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014) (citing *Saucier*, 533 U.S. at 201–02).  In this case, even assuming Marshall has alleged a violation of his substantive or procedural due process rights, those constitutional rights are not clearly established.

Marshall's substantive due process right to continuing his education free from arbitrary state action is not clearly established.  The Supreme Court has only assumed *arguendo* that such a substantive right exists in cases challenging academic dismissals from state universities.  *See e.g.*, *Ewing*, 474 U.S. at 222–23; *Horowitz*, 435 U.S. at 91–92.  The Sixth Circuit has also generally opted not to determine whether such a substantive due process right exists in cases challenging disciplinary dismissals from state universities, and has instead assumed such a right exists but determined that the assumed right was not violated.  *See e.g.*, *Bell*, 351 F.3d at 251. Moreover, Supreme Court cases and Sixth Circuit cases dealing with high school students tend to suggest that there is no such substantive due process right to continued school attendance.  *See e.g.*, *Rodriguez*, 411 U.S. at 33–37 (finding that the right to attend a public high school is not a fundamental right for purposes of substantive due process); *Seal*, 229 F.3d at 575 (analyzing whether discipline imposed upon a high school student was not rationally related to an offense instead of strictly scrutinizing the imposition of the discipline pursuant to substantive due process).

Similarly, Marshall's procedural due process rights are not clearly established.  It is clear that when a state provides a free education to minor children, those minors are entitled to fundamentally fair procedures before being suspended from school.  *Goss*, 419 U.S. at 567.

Nevertheless, a minor child who must attend school and who is deprived of the ability to do so for free as a form of discipline is distinguishable from a university student who is not required to attend school. For that reason, the Sixth Circuit has not decided this issue with certainty. *See* discussion *infra* at Part III.B.2.

For these reasons, the Court finds that Marshall had no clearly established substantive or procedural due process rights related to the disciplinary proceeding at OU. Although some courts have concluded that university students have such rights, the existence and contours of those rights appear to remain an issue of judicial debate. "If judges thus disagree on the constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). The Court finds that the individual defendants are entitled to qualified immunity for Marshall's § 1983 claims against them in their individual capacities for civil damages.

### b. Eleventh Amendment Immunity

The Eleventh Amendment also bars § 1983 suits against officials sued in their official capacities for damages. *Cady v. Arenac Cnty.*, 574 F.3d 334, 344 (6th Cir. 2009). Nevertheless, the Eleventh Amendment does not necessarily bar claims against officials in their official capacity for prospective injunctive relief. *Diaz v. Mich. Dep't. of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). Accordingly, the individual defendants are not immune to suit in their official capacities if Marshall seeks "prospective relief to end a continuing violation of federal law." *Id.*

Here, however, the alleged violations of federal law are predicated on past acts, not continuing conduct. Marshall alleges that in January and February of 2015, OU investigated his conduct; a hearing panel found that he violated the Policy; the panel recommended a one-

semester suspension for Spring of 2015; and Lombardi affirmed that suspension decision.  (Doc.

23, Am. Compl. at ¶¶ 40–43).  He alleges that these actions violated his rights and seeks to have

this Court vacate the suspension decision.  But these events occurred in the past and the

suspension for the Spring of 2015 semester has ended.  The hearing panel also recommended,

and Lombardi also affirmed, that Marshall would be permitted to petition for re-admittance.

Marshall does not allege that he petitioned for re-admittance or that he has been denied re-

admittance since his suspension ended.  Accordingly, although he seeks declaratory and

injunctive relief, he does not allege a continuing violation of federal law.  *Green v. Mansour*, 474

U.S. 64, 70–73 (1985) (injunctive or declaratory relief is available only when violations of

federal law are threatened or ongoing).  For this reason, the individual defendants are entitled to

Eleventh Amendment immunity for Marshall's § 1983 claims against them in their official

capacities.

**C.      Declaratory Judgment and Injunctive Relief**

In Counts I and III, Marshall requests that this Court invoke declaratory jurisdiction.

Specifically, Marshall requests that the Court enter a declaratory judgment that defendants

violated Title IX and Marshall's substantive and procedural due process rights by investigating

and suspending Marshall for his inappropriate behavior.  Defendants move to dismiss this claim.

The Court has already determined that Marshall has failed to state a claim for relief under the

due process clause or Title IX.  Without an actionable claim, there is no controversy to be settled.

*See Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (declaratory judgment act does not

create an independent cause of action); *Snyder Computer Sys. v. Lahood*, No. 2:10-cv-161, 2010

WL 3167851, at *3–5 (S.D. Aug 10, 2010 (Sargus, J.) (dismissing plaintiff's request for

declaratory judgment because underlying procedural due process claim failed).  Marshall's requests for a declaratory judgment in Counts I and III are dismissed.

In addition, in Count III, Marshall requests that the Court enter a declaratory judgment that the Policy "facially" violates Title IX.  Defendants move to dismiss this claim.  They assert that on its face, the Policy applies to all OU students, not just students of one gender.  They also cite *Gebser*, 524 U.S. at 291–92 (1998) and assert that arguably there is no private right of action to challenge a university policy that violates Title IX.  Marshall does not respond to defendants' motion to dismiss this claim.  The Court assumes Marshall concedes this point and abandons his "facial" challenge to the Policy.  Accordingly, the Court dismisses this claim in Count III because defendants filed a responsive pleading and Marshall failed to dispute their arguments or otherwise prosecute that claim.  *See* Fed. R. Civ. P. 41.

In Count V, Marshall seeks injunctive relief.  Injunctive relief is a remedy, not a cause of action.  *Reyes v. Wilson Mem. Hosp.*, 102 F. Supp. 2d 798, 801 n. 1 (S.D. Ohio 1998) (Rice, J.).  Because Marshall's Amended Complaint fails to state a claim upon which relief can be granted, his request for injunctive relief in Count V is dismissed.

## IV.    CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**.  The Clerk shall remove Document 28 from the Court's pending motions list.  The Clerk shall enter final judgment in favor of Defendants and **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**

 *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**